1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8

9    Danya Acosta,                              No. CV-22-00096-TUC-RCC

10                    Plaintiff,                **ORDER**

11   v.

12   State of Arizona, et al.,

13                    Defendant.

14

15        Pending before the Court is Defendant State of Arizona's ("Defendant" or "the

16   State") Motion for Summary Judgment. (Doc. 49.) This matter has been fully briefed.

17   (Docs. 49–50, 53–54, 59–61.)[1] The parties requested, and the Court held, oral argument

18   on May 28, 2024. For the reasons set forth herein, the Court will deny the motion.

19   **I.    Factual Background**

20        Plaintiff Danya Acosta ("Plaintiff" or "Acosta") is a female law enforcement

21   officer who previously worked for the Cochise County Sheriff's Office and the City of

22   Douglas Police Department. (Controverting Statement of Facts "CSOF," Doc. 54 ¶ 1.) In

23   May 2014, Acosta began working as a Special Agent ("SA") for the Arizona Attorney

24   General's Office ("AGO") Special Investigations Section ("SIS") Border Crimes Unit.

25   (*Id.* ¶ 2; ASOF ¶ 5.) The SIS is not a standalone law enforcement agency, but its agents

26   ---

27   [1] The State initially filed its Statement of Facts ("SOF") (Doc. 50) simultaneous with its Motion for Summary Judgment. However, on February 21, 2024, the State filed a Notice of Errata and Amended Statement of Facts ("ASOF"). (Docs. 59–60.) The State notified

28   the Court that it inadvertently omitted exhibit numbers in its original SOF but that the ASOF did not contain any other alterations. (Doc. 59 at 1.) The Court will therefore reference the ASOF.

investigate cases for prosecution by the Assistant Attorneys General. (*See* Doc. 60-3 at 72.) Her primary duty was to conduct investigations, including consulting with prosecutors assigned to the cases she was investigating. (ASOF ¶ 5.) Acosta was assigned to work mostly border crimes along the section of the border in Cochise County. (CSOF ¶ 3; Cuellar Decl. Doc. 54-1 at 91.) At the time she was hired Acosta lived in Douglas, Arizona, but she worked out of both the Tucson Office and the U.S. Department of Homeland Security Immigration and Customs Enforcement Homeland Security Investigations ("HSI") Office in Douglas. (CSOF ¶¶ 4–5.) In May 2015, Acosta was concurrently assigned as the Douglas Corridor Investigative Lead for an HSI Border Crimes Task Force ("HSI Task Force"). (*Id.* ¶ 4; Archuleta Decl., Doc. 54-1 at 74.) On the HSI Task Force, Acosta was responsible for "investigat[ing] port cases, money laundering cases, criminal syndicate, corruption and other cases." (*Id.* at 75.)

"Because of the nature and variety of work she and other agents were required to perform, sometimes at a moment's notice, Ms. Acosta's job was not like a typical law enforcement officer's job and could not be evaluated simply by looking at her statistics." (Cuellar Decl., Doc. 54-1 at 91.) Moreover, the border crimes cases that Acosta focused on were "completely different" from the cases of other SAs in the Tucson Office. (*Id.* at 90–91; Nusbaum Decl., Doc. 54-1 at 47.) Thus, while Acosta did not carry the workload of other SAs in the Tucson Office, her duties were a little different. (Olney Report, Doc. 60-1 at 87.) For example, being at the "Douglas port-of-entry require[d] her to respond to call outs more so than agents in the Tucson [O]ffice[,] [and] SA Acosta [did] not receive the amount of walk in or call in complaints that the agents assigned full time to the Tucson [O]ffice have." (*Id.*)

At the time Acosta was hired, there was, at the least, a discussion, and, at the most, an expectation, that she would move to Tucson within six months. (*Id.* at 82; Acosta Harassment Compl., Doc. 60-1 at 13–14.) Ultimately, Acosta did not move full time to Tucson. (Acosta Harassment Compl., Doc. 60-1 at 13.) Instead, she split the time, working between one and three days per week in the Tucson Office. (Olney Report, Doc. 60-1 at 82.) This was an issue for Acosta's first supervisor, Special Agent Supervisor

- 2 -

1
2
3
4
5
6

("SAS") Wes Dison, at least in part because it made it harder for him to monitor her work. (*See, e.g.*, *id.* at 82, 90.) But Acosta's next supervisor, SAS Paul Cuellar, stated that, given her work on border crimes, he "did not believe moving to Tucson made sense, and, to [his] knowledge she was not required to do so." (Cuellar Decl., Doc. 54-1 at 92.) He was able to sufficiently monitor her work through weekly discussions and reports. (*Id.* at 91.)

7

### a.  Facts Prior to Harassment Complaint

8
9
10
11
12
13
14
15
16
17

Dison, who was based in the Tucson Office, was Acosta's direct supervisor from the time she started in May 2014 until Dison resigned in October 2015. (CSOF ¶ 6.) Accounts of Dison and his leadership vary. The descriptions include: "forward and direct," "verbally loud and overbearing," (Olney Report, Doc. 60-1 at 88); "very professional," "direct and fair," "a breath of fresh air," (Ortiz Investigation Interview, Doc. 60-2 at 32); "volatile," "manipulative and extremely passive/aggressive," (Acosta Decl., Doc. 54-1 at 4); "an overlord type of supervisor [who] created a lot of crisis within the office to serve his own ends," "womanizer," "rude and nasty," (Nusbaum Decl., Doc. 54-1 at 47–48); "made up his own rules," and "failed to follow protocols," (Hill Decl., Doc. 54-1 at 42).

18
19
20
21
22
23
24
25
26
27
28

At some point, Dison began "making cute little comments" to Acosta. (Nusbaum Decl., Doc. 54-1 at 47.) Acosta described these as "unwelcome comments of a sexual nature." (Acosta Decl., Doc. 54-1 at 4.) At least one other SA also noticed that Dison "had a romantic interest in Ms. Acosta" and "[i]t was overt." (Nusbaum Decl., Doc. 54-1 at 47.) Dison would look her up and down, say clothes she wore were "sexy," say the pink gun grip Acosta used was "so hot," and explain he wanted her to come back to Tucson "and pretty up the office." (Acosta Decl., Doc. 54-1 at 4.) Acosta described Dison's comments as "frequen[t] and persisten[t]." (*Id.*) Acosta alleged that when she did not respond favorably, Dison would "become angry and berate or make veiled threats." (*Id.*) Acosta felt Dison gave her "excessive" and "unwarranted" attention, in particular with how often he would check up on her and "pressure" her to move to Tucson. (Olney Report, Doc. 60-1 at 83.) It is disputed whether these checkups were solely Dison's

1
2

attempt to supervise Acosta or related to her belief that Dison was inappropriately interested in her. (*See id.*)

3
4
5
6
7
8
9
10
11

Nonetheless, Dison continued to supervise Acosta. On April 10, 2015, Dison emailed Acosta with the subject "Time Management Issues." (*Id.* at 63.) Dison told her, "[Y]ou must understand the need to pay attention to the details and to complete requests when asked." (*Id.*) He said specifically that he needed Acosta to provide her vehicle mileage, statistics for the month, and "ETE." (*Id.*) Acosta responded within minutes with her mileage and said she submitted her "ETE" the day before but was having trouble scanning related documents. (*Id.*) Finally, she told Dison she would send the statistics. (*Id.*) About a week later, Dison followed up because Acosta had not yet submitted her statistics for March. (*Id.* at 64.) She responded that day with her statistics. (*Id.* at 65.)

12
13
14
15
16
17
18
19
20
21
22
23
24
25

On April 20, 2015, Dison finalized Acosta's Employee Evaluation Form that covered the period from her start on May 14, 2014 to December 31, 2014. (Doc. 54-1 at 36.) Acosta received a "Meets Expectations" or "Exceeds Expectations" in every category. (*Id.*) In the Supervisor Comments, Dison wrote in relevant part, "SA Acosta always made the extra effort to keep me updated, and she communicated effectively with our partner agencies in the coordination of multiple large scale investigations." (*Id.* at 37.) As the first of three identified "goals," Dison wrote: "Focus on improving time management skills to increase efficiency and productivity." (*Id.*) Neither of the other two goals addressed productivity or any related topic. (*Id.*) The evaluation feedback was consistent with Acosta's memory of Dison's comments to her regarding her work. (CSOF ¶ 11.) According to Acosta, Dison did not express any concerns about her work nor tell her that any of the prosecutors had issues with her. (*Id.*) He suggested that other SAs sometimes questioned her work because she worked remotely, but he assured her that he knew she was working. (*Id.* ¶ 12.)

26
27
28

In October 2014, Acosta approached Dison and Assistant Attorney General Nanette Morrow about a case Acosta brought with her when she left the Douglas Police Department. (Acosta Decl., Doc. 54-1 at 5.) She spoke with them about drafting charging documents against the defendant that Acosta would use to persuade him to cooperate as

an informant for the AGO. (*Id.*) Acosta avers she told Morrow she would "hold off filing the charging documents to see if the defendant would cooperate" and Morrow did not object to this plan or tell Acosta when she had to file. (*Id.*) Morrow opened the informant case and prepared a complaint on February 27, 2015. (Ortiz October 2015 Mem., Doc. 60-1 at 35.) On March 17, 2015, Morrow notified Acosta that the complaint and warrant were approved and ready to be picked up. (*Id.*; Acosta Decl., Doc. 54-1 at 5.) In April 2015, Morrow followed up with Acosta because she expected, but had not received, a court date upon the filing of the complaint. (Ortiz October 2015 Mem., Doc. 60-1 at 35.) The case note indicates that, at that time, Acosta had not filed the complaint because the defendant was cooperating. (*Id.* at 35–36.)

On June 23, 2015, AGO Section Chief Counsel of the Border Crimes Enforcement Unit, Kim Ortiz, had a standard case review with Morrow. (*Id.* at 36.) Ortiz supervised the Assistant Attorneys General in her unit. (Doc. 60-3 at 50, 70.) During the case review, they discussed Acosta's informant case and noted that Acosta had not provided any new updates. (Ortiz October 2015 Mem., Doc. 60-1 at 36.) Morrow was meant to follow up with Acosta—and says she did—but there is no record. (*Id.*)

On July 22, 2015, Dison sent Acosta an email saying "[e]very member of the squad is struggling to keep up" and listing seven open matters he needed her to update. (Doc. 60-1 at 69.) He closed the email with: "These are small items, but details that cannot be left unattended." (*Id.*) Later that morning, Acosta responded with updates on each of the seven items. (*Id.* at 70.)

On July 29, 2015, Morrow asked Dison for an update on the informant case. (Ortiz October 2015 Mem., Doc. 60-1 at 36.) That morning, Dison sent an email to Acosta telling her that the prosecutor asked for an update but that he could not recall knowing about this case and did not see that Acosta ever opened the case in the system for SIS. (Doc. 60-1 at 41.) He wrote, "Crim is holding the complaint. Who determined he would not be charged and instead allowed to work the charges?" (*Id.*) Within minutes, Acosta responded,

> I had talked to Nanette [Morrow] about this case and she told

1
2
3
4

> me I could do this. I believe I spoke to you about this guy as well. I don't remember when I did the case opening but I believe I did do one. With everything else that I've had going I have not been able to make contact with him. I will look for the report on this and forward it to you.

5
6
7
8
9
10
11
12
13

(*Id.* at 42.) Dison quickly replied verifying that Acosta had not contacted the informant in four months and told her, "And the prosecutors DO NOT determine who we work as informants. That is a decision for you and I to make, and I was never told of this. We need to get the paperwork straightened out ASAP." (*Id.*) Dison emailed again saying, "We can talk about this guy, but if he has been in the wind now for 4 months, he clearly is not going to work, so we need to move forward with charging." (*Id.* at 77.) Acosta sent Dison her paperwork and Dison decided that SIS would not open a case because there was not enough documentation of the informant's cooperation. (Ortiz October 2015 Mem., Doc. 60-1 at 37.)

14

### b.  Harassment Complaint

15
16
17
18
19
20
21
22
23

On August 5, 2015, Acosta filed an Employee Complaint Form against Dison and SA Octavio Gradillas. (*Id.* at 11–27.) She first alleged that Gradillas sexually harassed her on December 3, 2014 during a meal break at a nighttime training session when he began poking and tickling her while driving in the car. (*Id.* at 15–16.) Second, Acosta reported various comments and attentions from Dison that she alleged were unprofessional and aggressive and forms of both sex based and non sex based harassment. (*Id.* at 11–27.) The Court previously summarized these comments. *See supra* § I(a). Dison was immediately placed on administrative leave pending an investigation. (Doc. 60-2 at 48.)

24
25
26
27
28

Agent J. Olney was assigned to investigate Acosta's allegations. (Doc. 60-1 at 81.) Olney conducted interviews with ten individuals, including Acosta, Dison, and Ortiz. (*Id.* at 82.) In her interview with Olney, Ortiz described Dison's supervision as "very professional," "direct and fair," "a breath of fresh air," and "effective." (Doc. 60-2 at 32.) She noted that Dison and some prosecutors had been reporting concerns about Acosta. (*Id.* at 31–32.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

On August 19, 2015, Olney prepared and submitted an investigation report. (Doc. 60-1 at 81–93.) He found that there was evidence to support Acosta's allegations against Gradillas. (*Id.* at 29, 90.) Based upon these findings, Gradillas was terminated. (*Id.* at 30.)

Olney also concluded that "[t]here [was] a significant pattern of disagreement between SA Acosta and SAS Dison and their working relationship ha[d] deteriorated." (*Id.* at 90.) He identified her remote work as a major source of the stress, explaining that her desire to spend most of the week working on taskforce cases in Douglas conflicted with Dison's ability to easily supervise her. (*Id.* at 30, 90.) He also noted that while her work varied from other agents, she did carry a smaller caseload. (*Id.* at 87.) Olney concluded, "There is a lack of trust between them. In my opinion, SAS Dison has correctly identified SA Acosta needs additional training and mentoring. However, no improvement plan has been developed and implemented by SAS Dison which gives SA Acosta a clear outline of what her job and performance expectations are." (*Id.* at 90.) The report also noted that Acosta and other employees in the Tucson Office reported that Dison could be aggressive and intimidating. (*Id.* at 30.) Ultimately, the AGO Director of Operations concluded that "there [did] not appear to be evidence that [Dison's] conduct [was] unlawful harassment; i.e., targeted at SA Acosta because of a protected class she belongs to, such as female." (*Id.*)

Nonetheless, on September 2, 2015, Dison was issued a Memorandum of Concern from Donald E. Conrad, Division Chief Counsel. (Doc. 60-2 at 49.) The memorandum memorialized a verbal discussion between Dison and Conrad regarding his supervision of Acosta. (*Id.*) Conrad counseled Dison to stop using "inappropriate" or "demeaning and insulting" language. (*Id.*) Dison was also "required to temper [his] behavior and management style to eliminate the possibility that [he was] overly aggressive or intimidating when dealing with subordinates or colleagues." (*Id.* at 50.) The memorandum stated that Dison's "actions that gave rise to these incidents involving SA Acosta clearly reflect a lack of professionalism and fall short of what is expected of an employee of this office." (*Id.*)

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### c. Facts After Harassment Complaint

After Dison returned from leave, Ortiz conducted another case review with Morrow and emailed Acosta and Dison regarding the informant case on September 21, 2015. (Emails, Doc. 60-1 at 43.) Ortiz told Acosta:

> This case now is in lagging status. Our records show you have had the complaint prepared for filing since 4/27/15. This case was to be filed or the defendant was going to cooperate with the AGO. Please provide the status ASAP. This is the second case review with Nanette with no investigative update or progress.

(*Id.*) Acosta replied that she "was advised by Wes [Dison] that we would not move forward with this case last month and that he would speak to Nanette about closing the case." (*Id.* at 78.) Dison responded that "[b]ased on the original case dating back to November of 2013, and no contact with the potential source, it seemed appropriate the case be closed." (*Id.*) Ortiz then asked them to schedule a meeting where they could all discuss the case because "[s]ignals seem to have gotten crossed." (*Id.*)

On September 29, 2015, Acosta, Dison, Morrow, and Ortiz met. (Ortiz October 2015 Mem., Doc. 60-1 at 38.) Acosta explained that she did not file the charging documents in the informant case because she "did not get a clear deadline on when it had to be filed." (*Id.*) Ortiz agreed that, given the circumstances, the case should be closed. (*Id.*) According to her memo, Ortiz also told Acosta that "when an AAG gives her a complaint she needs to file it, that [Morrow] told her she needed to file it, and that it's not the attorney's responsibility to chase her down to make sure she filed it." (*Id.*)

On October 5, 2015, Acosta visited Morrow and repeatedly told Morrow that she knew what the September 29th meeting "was really about." (*Id.*) Morrow denied knowing what Acosta was referring to. (*Id.*) Later that day, Morrow told Ortiz about her interaction with Acosta. (*Id.* at 39.) Morrow also received an email from SA Matt Blong from HSI in which Blong talks about the informant case and tells Morrow that "through no fault of her own [Acosta] was advised to close the case." (*Id.*) Morrow relayed this information to Ortiz who then confirmed with Blong via a phone call. (*Id.*) Blong told

1   Ortiz that Acosta did not tell him anything other than the AGO was shutting down the

2   informant case. (*Id.*)

3         On October 14, 2015, Ortiz prepared a Memorandum ("October 14, 2015

4   Memo") to Chief Agent Mark Perkovich voicing two areas of concern regarding Acosta's

5   conduct: "(1) [e]fforts to couch appropriate counseling on expectations of prosecutors in

6   case management and informant management as retaliatory; and (2) [s]peaking

7   negatively about the office to other law enforcement partners." (*Id.* at 34.) The bulk of the

8   memorandum was a timeline of the informant case from late 2014 to October 2015. (*Id.*

9   at 35–40.) Acosta met with Perkovich to discuss the informant case and there is a dispute

10  about what he told her. (ASOF ¶ 23; CSOF ¶ 23.) Defendant asserts Acosta was "verbally

11  reprimanded . . . for lapses in procedure forcing the AGO to decline prosecution on the

12  Informant Case[,]" but the exhibits cited do not exactly support the characterization that

13  Acosta was reprimanded. (ASOF ¶ 15.) Rather, at the very least, the documents suggest

14  the two met and Perkovich told Acosta to file charging documents in a timely manner in

15  the future. (CSOF ¶ 23.) According to Acosta, she did not receive any formal policy

16  regarding criminal case submissions until one was issued on July 20, 2016. (Doc. 54-1 at

17  5.) While that policy states, "[i]t is expected that prosecutors and Special Agents will

18  work closely and communicate effectively throughout the course of the investigation[,]"

19  it does not specify a policy or timeline for filing charging documents. (*Id.* at 9.)

20        In early October, Dison resigned from the AGO. (ASOF ¶ 15.) He took a position

21  with the Arizona Department of Emergency and Military Affairs. (*Id.*) SAS Paul Cuellar

22  assumed the supervisor position. (*Id.* ¶ 24.)

23        On February 2, 2016, Cuellar completed Acosta's Employee Evaluation Form that

24  covered the period from January 1, 2015 to December 31, 2015. (Doc. 54-1 at 38.) She

25  again received a "Meets Expectations" or "Exceeds Expectations" in all categories. (*Id.*)

26  Because both Dison and Cuellar were her supervisors for the review period, "input to this

27  evaluation was gleaned from both supervisors." (*Id.* at 39.) The three goals identified

28  were not related to increasing productivity or complying with any related policies. (*Id.*)

No issues were highlighted. (*Id.*) During his time as Acosta's supervisor, Cuellar states

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

that he "had no concerns about Ms. Acosta's work performance." (Cuellar Decl., Doc. 54-1 at 91.)

On May 23, 2016, Acosta received a letter from Paul Ahler, Division Chief Counsel, informing her that she was being awarded the "FY2016 Merit-Based Incentive" in recognition of "exemplary individual performance that resulted in agency efficiencies, cost savings, or improved productivity." (Doc. 54-1 at 40.) The letter said that "[t]his recommendation was made by [her] supervisor and/or division leadership." (*Id.*)

On September 9, 2016, Cuellar resigned. (Doc. 60-1 at 46; Doc. 60-3 at 29.) Ortiz became the interim supervisor for SAs in the SIS. (Doc. 60-3 at 51.) On September 12, 2016, Ortiz scheduled a meeting for all SIS personnel to review cases. (*Id.* at 59; Doc. 60-1 at 46.) Acosta did not attend the meeting due to illness. (Doc. 54-1 at 6.)

Ortiz and Acosta met separately on September 21, 2016. (Doc. 60-1 at 46.) Ortiz reviewed Acosta's case log. (*Id.*) Ortiz found that the log only contained 19 cases.[2] (*Id.* at 45.) Of those, Ortiz concluded nine could be closed immediately; three were with prosecutors and had no investigative leads; three had been open for years or months without a completed investigation; one was open but with no indication of what Acosta was doing to assist HSI; one had passed the statutory time limit to process a money seizure for forfeiture; and only two were actually open and active. (*Id.* at 45.) Acosta avers that she was surprised to find there were issues with her cases and that Ortiz did not show her documentation supporting these conclusions but summarily told her that most of her cases had already been closed on the prosecution side. (Doc. 54-1 at 6.) While these facts are disputed, Acosta states she tried to ask Ortiz questions but was not permitted to do so and was not offered further explanation. (*Id.* at 7; Doc. 60-3 at 40, 78, 80.) Ortiz did not find credible Acosta's statements explaining why cases were in her case log. (ASOF ¶ 39.)

In her deposition, Acosta stated that, on a case-by-case basis, she would keep a case open even if the file was closed on the prosecution side because she was "still actively investigating them." (Doc. 60-3 at 40–45.) The procedure and division of labor is

---

[2] There were 21 cases in the log, but two were duplicates. (Doc. 60-1 at 45.)

1
2
3
4
5
6

unclear. Morrow explained in her deposition that, if she were going to close a case, she would normally communicate with the investigator and tell them they could re-present it to her if they obtained further evidence. (*Id.* at 87–88.) She stated, "What I do has no bearing on what the investigators do. That is through their supervisors that they're supposed to document. The only time I'm kind of overseeing whether it's ready for prosecution is when they're bringing me in." (*Id.* at 88.)

7
8
9
10
11
12
13
14
15
16
17

On the same day of her case review with Acosta, Ortiz drafted a memorandum to Ahler ("September 21, 2016 Memo") in which she recommended that the AGO "[t]erminate Acosta immediately. (Doc. 60-1 at 45–50.) She wrote that "SA Acosta previously was counseled in October, 2015 for breaches of AGO policy and procedure, and for ineffective case management." (*Id.*) Ortiz summarized her review of Acosta's 19 cases and wrote that "[a] review of Acosta's job performance reflects continuing failure to effectively manage the AGO's cases and promote the AGO's interests in submitting prosecutable cases." (*Id.*) In her deposition, Ortiz stated that she did not review Acosta's employee evaluations and did not herself write any other memoranda regarding Acosta between the October 14, 2015 Memo and the September 21, 2016 Memo. (Doc. 54-1 at 56, 65.)

18
19
20
21
22
23

After a two-day "decision-making process," which involved Ahler consulting with AGO Director of Operations Leslie Heathcotte, Ahler terminated Acosta's employment. (Doc. 60-3 at 114.) Ahler did not specify further what the decision-making process entailed. (*Id.*) He stated in his deposition that "[d]uring [his] time as the Criminal Division Chief, Ms. Acosta had ongoing performance issues, mainly concerning her case management and productivity." (*Id.*)

24
25
26
27
28

On September 23, 2016, Acosta met with Ortiz. (*Id.* at 23.) Ortiz and Acosta were in person; also in attendance was a representative from Human Resources who attended by phone. (*Id.*) Ortiz informed Acosta that she was to be terminated and gave her the option to resign. (*Id.* at 24.) Acosta asked for the reason behind her termination, but alleges Ortiz simply told her she did not need a reason and that her services were no longer needed. (*Id.* at 25.) Acosta did not resign and was terminated. (*Id.* at 6, 26.)

- 11 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Acosta brought this action alleging that Ortiz recommended her termination in retaliation for her filing a harassment complaint against Dison. (Doc. 1.) Acosta avers that Dison "often bragged to his subordinates about his close relationship with Criminal Section Chief Kim Ortiz, and the fact that the two vacationed, camped and went to movies together." (Doc. 54-1 at 5.) Virginia Hill, who served as an administrative assistant under Dison, declared that "Mr. Dison told me that he and Kim Ortiz were very good friends. At one point he mentioned that their families had gone on vacation to Mexico together." (*Id.* at 42–43.) SA Roger Nusbaum, who worked in the Tucson Office with Dison and Acosta, declared that "[s]ome of the female agents were afraid of Dison because of personality traits and his relationship with Section Chief Kim Ortiz. Dison was often in Ms. Ortiz's office and would often brag about vacationing in Mexico and camping with Ms. Ortiz. Mr. Dison let everyone know that he and Ms. Ortiz were close personal friends and that he was untouchable." (*Id.* at 47.) Carlos Archuleta, who served as the Assistant Special Agent in Charge of the Douglas Arizona Corridor for HSI and supervised Acosta on the task force, declared that he "learned that the A.G.'s Office Criminal Section Chief Kimberly Ortiz was trying to get Mr. Dison a job with the FBI's Border Corruption Task Force. During that time, [Archuleta] heard several rumors that . . . [Dison] and Ms. Ortiz were involved in a romantic relationship." (Doc. 54-1 at 75.)

In her deposition, Ortiz stated that she and Dison were friends. (Doc. 60-3 at 56.) She explained how she and her husband once met up with Dison and his wife camping. (*Id.*) She also clarified: "I mean probably I can count the times I've seen him out of the office on one hand." (*Id.*) Ortiz disputes that she tried to find Dison a job. (Doc. 60-3 at 56.) She stated that she may have served as a personal reference for him. (*Id.*)

## II.     Motion for Summary Judgment

The State seeks summary judgment arguing that Acosta cannot establish a causal link between her complaint against Dison and her termination. (Doc. 49 at 9.) It emphasizes that Ortiz had no reason to be biased against Acosta. (*Id.* at 10.) The State further highlights that Ortiz did not make the ultimate decision to terminate Acosta and asserts there is no evidence that the actual decisionmaker—Ahler—knew about the

harassment complaint or was influenced by Ortiz's bias (because she had none). (*Id.* at 9.) It further argues that the yearlong gap between the filing of the harassment complaint and the termination precludes any finding of causation. (*Id.* at 10.) Even if a causal link exists, the State argues that documented issues with Acosta's case management were legitimate non-retaliatory reasons for her termination. (*Id.* at 11.)

Acosta opposes the motion because, she argues, there is a genuine issue of material fact regarding the but-for cause of her termination. (Doc. 53 at 1.) Specifically, she asserts that, after Acosta filed the harassment complaint, Ortiz "demonstrated a pattern of antagonism toward Acosta and pursued Acosta's termination . . . ." (*Id.* at 9.) This pattern allegedly includes speaking negatively about Acosta to Olney during the harassment investigation, inappropriately chastising Acosta once Dison returned from leave, and ultimately recommending Acosta's termination shortly after Ortiz became her supervisor without consulting her employee evaluations or her most recent supervisor. (*Id.* at 10.)

Acosta further asserts that the year between when she submitted her complaint against Dison and when Ortiz recommended her termination is not fatal because there were legitimate reasons why neither Dison nor Cuellar saw fit to terminate her. (*Id.* at 10.) Specifically, Acosta argues that she was "highly regarded by her supervisors and did a very good job . . . " until Ortiz became her interim supervisor and "orchestrated Acosta's termination." (*Id.*) Accordingly, Acosta asserts that a reasonable jury could conclude that Ortiz's claimed reasons for recommending her immediate termination were pretextual. (*Id.*)

Although Ahler terminated Acosta, Acosta argues that Ortiz influenced his decision, and her alleged bias can be imputed to Ahler. (*Id.* at 10–11.) Acosta asserts that Ortiz's September 21, 2016 Memo mislead Ahler because it falsely stated Perkovich "counseled" Acosta for breaches of policy and inaccurately summarized her case log. (*Id.*) Acosta also argues that the quick timing and lack of supporting evidence offered by Ahler suggest he relied solely on Ortiz's recommendation. (*Id.* at 11.) Acosta highlights that only two days passed between the September 21, 2016 Memo and her termination.

1
2
(*Id.*) She also underscores her positive employee evaluations and the merit-based award she received. (*Id.*)

3
### III.     Summary Judgment Standard

4
5
6
7
8
9
10
11
12
A court may grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). An issue is genuine when the disputed facts "could reasonably be resolved in favor of either party." *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)). A disputed fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

13
14
15
16
17
18
19
20
21
The moving party bears the initial burden of establishing there is no genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. At that point, the burden shifts to the non-moving party to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A party's bare assertions are not enough to create a genuine issue of material fact that will defeat summary judgment. *See* Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248; *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) ("[A]n employee's subjective personal judgments of [his] competence alone do not raise a genuine issue of material fact.").

22
### IV.     Title VII Retaliation Standard

23
24
25
26
27
28
Where there is no direct evidence of unlawful retaliation, a court applies the burden shifting test outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). First, the plaintiff must establish a prima facie case of retaliation. *Id.* at 802. However, the degree of proof necessary to establish a prima facie case at summary judgment is minimal. *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094 (9th Cir. 2005) (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994); *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 659–60 (9th Cir. 2002)). A prima facie case of

1
2
3
4

Title VII retaliation requires the plaintiff to show "(1) engagement in a protected activity, (2) an adverse employment action, and (3) a causal link between the two." *Days v. LSI Corp.*, 174 F. Supp. 3d 1130, 1166 (D. Ariz. 2016) (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000)), *aff'd*, 705 F. App'x 539 (9th Cir. 2017).

5
6
7
8
9
10
11
12
13
14

To establish causation, the plaintiff must prove "that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). This requires "evidence that the employer was aware that the plaintiff had engaged in the protected activity." *De La Torre v. Merck Enters., Inc.*, 540 F. Supp. 2d 1066, 1083 (D. Ariz. 2008) (quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)). A subordinate's retaliatory bias can be imputed to the employer if the plaintiff can show that the allegedly independent termination decision was not actually independent because the biased subordinate influenced or was involved in the decision or decision-making process. *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007).

15
16
17
18
19
20
21
22
23
24
25
26
27
28

The time between the protected activity and adverse employment action may also be relevant to whether a causal link exists. *See, e.g.*, *Pardi v. Kaiser Found. Hosp.*, 389 F.3d 840, 850 (9th Cir. 2004). For example, "[w]hen adverse employment decisions closely follow complaints of discrimination, retaliatory intent may be inferred." *Id.* (citing *Bell v. Clackamas Cty.*, 341 F.3d 858, 865–66 (9th Cir. 2003)). A gap of a year has been found in some cases to be too remote. *See Vasquez v. City of L.A.*, 349 F.3d 634, 646 (9th Cir. 2003), as amended (Jan. 2, 2004); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064–65 (9th Cir. 2002). However, "a specified time period cannot be a mechanically applied criterion. A rule that any period over a certain time is too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simple." *Porter v. Dep't of Corrs.*, 419 F.3d 885, 895 (9th Cir. 2005) (quoting *Cozalter v City of Salem*, 320 F.3d 968, 977–78 (9th Cir. 2003)). Rather, the inquiry is highly context specific. *Id.* The courts assess whether temporal proximity is the only evidence of retaliation and whether there are "valid reason[s] for the delay between her alleged protected activities and the claimed adverse actions." *Id.*

- 15 -

If the plaintiff can establish a prima facie case, the burden of production then shifts to the defendant to put forth legitimate, nonretaliatory reasons for the challenged action. *McDonnell Douglas Corp.*, 411 U.S. at 802. At that point, "any presumption that the defendant discriminated 'drops from the case,' and the plaintiff must then show that the defendant's alleged reason . . . was merely a pretext for discrimination." *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004). The plaintiff must provide specific and substantial proof that the defendant's proffered reasons are not only false but also that retaliation was the true motive. *See Zelaya v. Coca-Cola Co.*, 158 F. App'x 809, 811 (9th Cir. 2005) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998) ("Such evidence of 'pretense' must be 'specific' and 'substantial' in order to create a triable issue."). "The burden of persuasion, as opposed to production, however, remains with the plaintiff at all times." *Bodett*, 366 F.3d at 743.

### V.    Discussion

#### a.  Prima Facie Case

Here, the parties do not dispute that Plaintiff engaged in a protected activity by filing her harassment complaint or that she suffered an adverse employment action when she lost her job. The only element of a prima facie case that is at issue is whether a causal link exists between these two incidents.

The Court, viewing the pleadings in the light most favorable to Plaintiff, but making no determination as to the veracity of her allegations, finds that summary judgment is not appropriate. Plaintiff has raised genuine issues of material fact regarding the causal link. Specifically, there is a genuine dispute about the friendship between Dison and Ortiz and what, if any, impact that relationship had on Ortiz's recommendation to terminate Acosta. This is a dispute that a reasonable jury could resolve in favor of either party. In other words, a reasonable jury could disagree whether Ortiz would have recommended Acosta's termination but for her allegations about Dison that resulted in a written reprimand and his ultimate resignation. As is relevant to deciding whether to grant summary judgment, Acosta offers more than just her own assertions that a

1
2
3
4

friendship between Dison and Ortiz could have influenced her termination. She presents statements from other individuals who worked in the office and these individuals allege that, at the very least, Dison made it appear that he was "untouchable" because of his friendship with Ortiz.

5
6
7
8
9
10
11
12

The variety of these allegations, in conjunction with the fact that Ortiz was not in a direct position to terminate Acosta until she did so, a year after the complaint, lead the Court to conclude that the yearlong gap alone is not determinative. Moreover, to the extent that a jury could find Ortiz was biased against Acosta, this bias can be imputed to Ahler. Although Ortiz was not the official decisionmaker, the facts as presented lack specificity regarding Ahler's independent review of Acosta during the "decision-making process." The short time between Ortiz's recommendation and Ahler's termination could lead a reasonable jury to conclude that Ahler's decision was not actually independent.

13

### b. Legitimate, Non-Retaliatory Reasons for Termination

14
15
16
17
18
19
20
21
22
23
24
25

The State has put forth Acosta's failing job performance as a legitimate, non-retaliatory reason for her termination. However, there are conflicting facts about her performance. At the same time that Acosta was facing scrutiny from Dison, Morrow, and Ortiz about her handling of the informant case, Dison wrote her a positive employee evaluation. And only a few months before Ahler terminated Acosta's employment, he sent her a letter informing her that she was receiving a supervisor-nominated merit-based award for "exemplary individual performance." Cuellar also wrote Acosta a positive performance evaluation. He stated that he had no concerns about Acosta during his time as her supervisor. But within days of becoming her interim supervisor upon Cuellar's resignation, Ortiz had enough concerns with Acosta's cases to recommend her immediate termination. This conflict creates a genuine issue of material fact about the State's legitimate, non-retaliatory reasons to terminate Acosta.

26

### c. Pretext

27
28

Finally, Plaintiff has established that there is a genuine dispute of material fact regarding whether Defendant's proffered reasons for her termination are pretextual. First, as the Court previously explained, there is notable disagreement over Acosta's job

performance. The cited documents from both parties outline very different yet contemporaneous accounts of her performance.

Second, the fact that Ahler relied almost exclusively on Ortiz's recommendation when terminating Acosta brings forward the importance of Ortiz's alleged bias. At this stage, Acosta has produced highly contested but specific and substantial allegations around Dison and Ortiz and whether their friendship impacted Ortiz's decision to reprimand Acosta in October 2015 and recommend her termination is September 2016. These allegations are based on her account and that of others, could be reasonably resolved in favor of either party, and would affect the outcome of the suit. It is therefore the type of factual issue that is not appropriate for resolution on summary judgment.

**VI.    Conclusion**

For the forgoing reasons,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **DENIED**. (Doc. 49.)

Dated this 28th day of May, 2024.

Honorable Raner C. Collins
Senior United States District Judge